# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | **CRIMINAL COMPLAINT** |
| v. | : | |
| MOSHE ALTMAN, a/k/a "Michael Altman" | : | Mag. No. 09-8125 (MCA) |

I, Robert J. Cooke, being duly sworn, state that the following is true and correct to the best of my knowledge and belief.

### SEE ATTACHMENT A

I further state that I am a Special Agent with the Federal Bureau of Investigation, and that this complaint is based on the following facts:

### SEE ATTACHMENT B

continued on the attached pages and made a part hereof.

*Robert J. Cooke*
Robert J. Cooke, Special Agent
Federal Bureau of Investigation

Sworn to before me and subscribed in my presence,

July 21, 2009, at Newark, New Jersey

HONORABLE MADELINE COX ARLEO
UNITED STATES MAGISTRATE JUDGE

*Madeline Cox Arleo*
Signature of Judicial Officer

## ATTACHMENT A

### Count 1

In or about July 2007, in Hudson County, in the District of New Jersey and elsewhere, defendant

MOSHE ALTMAN,
a/k/a "Michael Altman"

did knowingly and willfully conspire with a Jersey City Building Inspector to obstruct, delay, and affect interstate commerce by extortion under color of official right, by assisting in arranging for corrupt cash payments to be paid by another, with that person's consent, for the JC Building Inspector's benefit in exchange for the Building Inspector's official assistance.

In violation of Title 18, United States Code, Section 1951(a) and Section 2.

### Count 2

From in or about March 2007 to in or about June 2009, in Hudson County, in the District of New Jersey and elsewhere, defendant

MOSHE ALTMAN,
a/k/a "Michael Altman"

knowingly and willfully conspired with others to conduct and attempt to conduct financial transactions involving property represented to be the proceeds of specified unlawful activity, specifically, bank fraud, bankruptcy fraud and trafficking in counterfeit goods, with the intent to conceal and disguise the nature, location, source, ownership, and control of the property believed to be proceeds of specified unlawful activity, contrary to Title 18, United States Code, Section 1956(a)(3).

In violation of Title 18, United States Code, Section 1956(h).

2

**ATTACHMENT B**

I, Robert J. Cooke, a Special Agent with the Federal Bureau of Investigation ("FBI"), following an investigation and discussions with other law enforcement officers, am aware of the following facts. Because this Attachment B is submitted for the limited purpose of establishing probable cause, I have not included herein the details of every aspect of this investigation. Nor have I recounted every conversation involving the defendant. All conversations referred to in this attachment were recorded, unless otherwise indicated, and are related in substance and in part.

**Count 1**

1. At all times relevant to this Complaint, defendant Moshe Altman, a/k/a "Michael Altman" (hereinafter, "defendant Altman") was a real estate developer based in Hudson County.

2. At all times relevant to Count 1 of this Complaint, there was an individual who served as a Building Inspector for the City of Jersey City ("JC Building Inspector"). The JC Building Inspector was responsible for, among other things, performing inspections and certifying buildings for compliance with pertinent federal, state, and local standards, codes, regulations and procedures including zoning standards.

3. There was a cooperating witness (the "CW") who had been charged with bank fraud in a federal criminal complaint in May 2006. Thereafter, for the purposes of this investigation conducted by the FBI, the CW posed as (a): a real estate developer interested in development in the greater Jersey City area and (b) the owner of a counterfeit handbag business. The CW represented that the CW did business in numerous states, including New York and New Jersey, and that the CW paid for goods and services in interstate commerce.

4. On or about July 10, 2007, defendant Altman met with the CW at defendant Altman's place of business in Union City, New Jersey. During this meeting, defendant Altman explained to the CW that defendant Altman had arranged for the CW and defendant Altman to make a corrupt cash payment to the JC Building Inspector in exchange for zoning approvals for properties that the CW and defendant Altman sought to develop in Jersey City. During this same meeting, defendant Altman acknowledged to the CW that defendant Altman had made corrupt cash payments to the JC Building Inspector in the past, in exchange for the JC Building Inspector's approvals and other official assistance.

5. On or about July 11, 2007, defendant Altman met with the CW at defendant Altman's place of business in Union City. During that meeting, defendant Altman explained to the CW that defendant Altman would accompany the CW to meet with the JC Building Inspector and that defendant Altman would take the JC Building Inspector to the boiler room in the building where the meeting would take place.

6. On or about July 11, 2007, defendant Altman, the JC Building Inspector, and the CW met at a building that defendant Altman owned in Jersey City. After entering the building, defendant Altman informed the JC Building Inspector that the CW was interested in developing properties in Jersey City, but was looking for a "comfort level" on "zoning" and other matters. The JC Building Inspector responded, "[y]ou're not gonna have any problem with anything with me . . . whatever we have to do, I can get it done." Then, the JC Building Inspector explained that he could help the CW gain approval for more units in a particular building: "[w]orst-case scenario . . . we have to put in for a variance . . . go before the Board of Adjustment, we present the set of plans, the whole bit, but I get the blessing from everybody up above for that to go through."

7. As defendant Altman stepped into the building's boiler room, the JC Building Inspector and the CW continued their meeting. The JC Building Inspector then accepted $20,000 in cash from the CW with the JC Building Inspector being advised by the CW: "got there 20," meaning $20,000. The JC Building Inspector was advised by the CW that the $20,000 was "on deposit" and that there would be additional payments in exchange for the JC Building Inspector's future official assistance. The JC Building Inspector was further advised by the CW "[t]ake care of me. I'll take care of you." Indicating that he was comfortable with the corrupt relationship, the JC Building Inspector replied, "Absolutely." The JC Building Inspector further stated that he was "around all the time" and supplied the CW with his cell phone number. The JC Building Inspector then briefly met with defendant Altman in the boiler room. To create the pretext of an inspection, the JC Building Inspector stated, "Everything looks good here," as he began to leave the building.

## Count 2

8. At all times relevant to Count 2 of this Complaint, a check with the New Jersey Department of Banking and Insurance and the New York State Department of Banking revealed that defendant Altman did not hold a license to transmit or remit money.

4

9. At all times relevant to Count 2 of this Complaint:

A. Coconspirator Itzak Friedlander, a/k/a "Isaac Friedlander," (hereinafter "Friedlander") was a business partner of defendant Altman and an employee of defendant Altman's real estate development company.

B. Coconspirator Shimon Haber was a real estate developer, who worked in New York and New Jersey.

C. A check with the New Jersey Department of Banking and Insurance and the New York State Department of Banking revealed that Friedlander and Haber did not hold a license to transmit or remit money.

10. On or about March 6, 2007, defendant Altman and Haber met with the CW at Altman's place of business in Union City. During this meeting, defendant Altman, Haber and the CW discussed the mechanics of a scheme wherein they would make corrupt payments to various public officials in Hudson County in exchange for various forms of official action and approvals. In that regard, the CW asked defendant Altman and Haber about their ability to launder money that the CW would provide in furtherance of these illicit deals. The CW stated, "Question is. If I bring in money. How many of these guys can convert it? No?" Referring to defendant Altman, Haber advised the CW, "Talk to him, he has 'washing machines'," meaning money-laundering contacts. Given the amounts and breadth of the illicit laundering scheme being discussed, Haber remarked, the CW "needs a laundromat." Referencing the fact that the first floor of the building in which Altman's place of business was located actually housed a laundromat, with a prominent sign reading "LAUNDROMAT," defendant Altman quipped that they "got one down here." As the conversation continued, the CW asked defendant Altman, "he converts from green to check . . . whatever?" Defendant Altman responded that his money-laundering contact performed such laundering and likened his contact to money-laundering "converters" based in Israel. Haber then reaffirmed the "money-laundering" scheme as he emphasized to defendant Altman, the CW "needs a converter," a reference to an individual who converts criminally derived monies into some other form of asset in order to conceal its illegal origins. Thus, in this conversation, defendant Altman and Haber discussed the prospect of Altman's utilizing his money-laundering contacts in furtherance of an overarching scheme to bribe public officials in Hudson County in exchange for their official action and influence.

11. On or about March 28, 2007, the CW met with defendant Altman and Haber at Altman's place of business in Union City. Defendant Altman, Haber and the CW discussed a money-laundering arrangement. Defendant Altman asked the CW if the CW needed a "washing machine," a reference to a money-laundering transaction. The CW replied, "Yeah, but not all in one shot." The CW continued, "I'm talking 20 to 50 now," a reference to $20,000 to $50,000, with more to follow. Defendant Altman asked the CW, "Which way is it going?" The CW responded, "I have checks." At this point in the conversation, the parties began to whisper and defendant Altman instructed the CW, "Do me a favor, just write," meaning communicate about the scheme in a non-audible, written manner in order to evade detection.

12. With the assistance of Haber, the CW wrote the following three questions on a scrap of paper for defendant Altman: 1) "Check to who"?; 2) "How much do charge 10% is fine"; and 3) "how long to wash"? In response to question one, defendant Altman wrote "Gemach Shefa Chaim."[1] Defendant Altman did not provide a written response to question two. In response to the final question concerning the laundering period, defendant Altman wrote "1 wk To 2 wks." After completing the written questions and answers, defendant Altman confirmed for the CW that charities would be utilized to launder the monies that CW would provide. Lastly, the CW stated, "Because of the bankruptcy court no one can know nothing," a reference to concealing the illicit arrangement. The CW informed defendant Altman and Haber that the ongoing bankruptcy proceedings required the CW to declare "all assets," to include anything of value, even items such as "cars," "watches," "furs," "firearms," "jewelry," and "suits." Defendant Altman and Haber indicated that they understood and that concealing these matters from the authorities was not an issue.

13. On or about May 8, 2007, defendant Altman met with the CW at defendant Altman's place of business in Union City and continued to discuss, among other things, the money-laundering arrangement. The CW asked defendant Altman, "How much can [the Gemach] handle at once for me?" Defendant Altman responded, "What's the numbers? Just tell me the numbers." When the CW discussed a "silent partner" owing the CW money from "deals" and that the partner would provide the CW with checks ranging from $25,000 to $100,000 for conversion to cash, defendant Altman reassured the CW that he could handle it and that he would conceal the illicit arrangement from anyone at the organizational

---

[1] Note that during the course of the investigation, the subjects and the CW have alternated spellings between "Gmach" and "Gemach" but there is no substantive difference.

front and all others, to include the bankruptcy trustee and the bankruptcy court. With regard to turnaround time for converting the checks to cash, defendant Altman stated that it could take "A week, 10 days, it depends. It's not all taken out right away. So it can take two weeks."

14. On or about May 21, 2007, in the morning, another individual met with the CW in Deal, New Jersey. At that meeting, this individual furnished the CW with a check in the amount of $18,000. The check was made payable to Gmach Shefa Chaim that defendant Altman specified to the CW in the March 28th meeting.

15. On or about May 21, 2007, in the early afternoon, defendant Altman met with the CW at Altman's place of business in Union City. During the meeting, defendant Altman received this $18,000 check from the CW. After providing defendant Altman with the check, the CW indicated that the CW did not need a copy of the check "because I don't keep records." Defendant Altman agreed that was best. As the conversation continued, defendant Altman was informed by the CW of the illegal source of the funds. The CW stated, "basically, guy owes me money from bank deals, 'schnookie' bank deals no one knows about and no one could know about . . . this guy's a partner of mine." Defendant Altman was further advised by the CW that the CW expected another $50,000 check from the partner next week that the CW would need laundered into cash. Defendant Altman replied, "Okay, very good." Defendant Altman further indicated that he would launder the check into cash for return to the CW by June 12, 2007. Thus, in this conversation, defendant Altman acknowledged that he understood the illegal source and nature of the funds that the CW supplied him with for both laundering purposes and to hide assets from the CW's ongoing bankruptcy proceedings.

16. On or about June 12, 2007, defendant Altman met with the CW at Altman's place of business in Union City. During the meeting, defendant Altman supplied the CW with approximately $15,300 in cash, which represented the proceeds of the $18,000 check from May 21st less a 15% money-laundering fee. Defendant Altman stated to the CW that "he [a reference to Altman's money laundering contact] took off 15%" rather than 10% because the amount of money was low. Defendant Altman further advised the CW that his money-laundering contact asked him where the check was from, but that defendant Altman did not disclose the CW's identity as defendant Altman promised. Defendant Altman stated, "I keep my word." As before, defendant Altman and the CW also discussed the illicit nature of the CW's proceeds and the need to conceal the money-laundering arrangement from defendant Altman's money-laundering contact, as well as from the bankruptcy court

and authorities. The CW stated, "Number one, I have the bankruptcy thing. Number two, I have at least $100,000 a month coming from money I 'schnookied' from banks for bad loans. This guy can't know nothing." In response, defendant Altman assured the CW that there would be no problem.

17. At this same meeting, defendant Altman also accepted a $75,000 check from the CW to launder. Defendant Altman and the CW discussed the turnaround time to launder the check and defendant Altman indicated that "he'll [a reference to Altman's money-laundering contact] do it quickly." The check was made payable to the Gemach Shefa Chaim and drawn on the account of BH Property Management-- an FBI undercover company. A review of bank records indicates that on or about June 15, 2007, BH Property Management Check No. 1023, in the amount of $75,000, was posted to an account maintained by Valley National Bank in the name of Gmach Shefa Chaim.

18. On or about June 26, 2007, Friedlander met with the CW at defendant Altman's place of business in Union City. During the meeting, Friedlander advised the CW that defendant Altman had "stepped out" and then handed the CW a white plastic bag containing approximately $54,800 in cash. This cash amount was a partial return on the $75,000 check that defendant Altman had accepted on or about June 12, 2007, for laundering.

19. Approximately twenty-five minutes after the CW had arrived at defendant Altman's place of business in Union City, defendant Altman arrived and met with the CW. During their meeting, defendant Altman and the CW discussed the fact that the cash that Friedlander had provided the CW was "short." Pursuant to the laundering fee arrangement that defendant Altman struck with the CW, the remaining cash due from defendant Altman was approximately $8,950. Defendant Altman indicated to the CW that he would advise the CW in the next day or two as to whether he had the remaining $8,950 in cash. As the conversation continued, defendant Altman accepted for laundering another $50,000 check from the CW, which the CW characterized as further proceeds from the CW's "bank 'schnookie' deals." The check was drawn on the account of BH Property Management and made payable to Organization 1. When the CW asked defendant Altman if his money-laundering contact could convert the checks to cash more quickly, defendant Altman laughed in agreement with the CW stating, "You're right. I should teach him the business." A review of bank records indicates that on or about July 6, 2007, the $50,000 check was posted to an account maintained by Valley National Bank in the name of the Gemach Shefa Chaim.

20. On or about July 5, 2007, defendant Altman met with the CW at Altman's place of business in Union City. At this meeting, defendant Altman gave the CW approximately $9,050 in cash to complete the money laundering transaction of June 12, 2007. Defendant Altman mistakenly overpaid the CW $100 on this occasion since the return due was approximately $8,950.

21. On or about July 16, 2007, defendant Altman met with the CW at Altman's place of business in Union City. During the meeting, defendant Altman gave the CW approximately $30,000 in cash. This cash amount was a partial return on the $50,000 check that defendant Altman accepted on or about June 26, 2007 for laundering. While defendant Altman and the CW counted the cash, the CW joked about getting defendant Altman a cash-counting "machine" to make this aspect of the laundering process easier. Concerned about concealing his illicit conduct, defendant Altman responded, "See, if you have one [i.e., a cash-counting machine], it means . . . don't want somebody goes to the office, sees one, and says, hey!"

22. During the meeting, defendant Altman and the CW discussed the next money-laundering transaction and the turnaround time entailed with defendant Altman's money-laundering contact washing future checks that the CW would supply. The CW stated, "Now I have 75 more [i.e., $75,000] from one of my bank deals there. How quickly can he turn it, this guy?" Defendant Altman replied, "it's anywhere normally two weeks to four weeks. That's how he works." Reaffirming the illicit origin of the monies that the CW was supplying to defendant Altman, the CW then explained, "The problem is the deal I have with the guy [meaning the CW's purported partner], we took money from a bank on a nonexistent property, and I have half a million coming but I don't want to take it until I know I can turn it fast." In response, defendant Altman stated, "It doesn't make any difference if its 75 or 300 [meaning $75,000 or $300,000] to me . . . when I give it to him there is not a lot of difference." Regarding the structuring of the next series of money-laundering transactions, defendant Altman advised the CW that his money-laundering contact uses the names of three other "Gmachs," in addition to the Gmach Shefa Chaim that defendant Altman already had the CW use in earlier transactions, as charitable fronts to launder money. Again, the CW made clear the illegal genesis of the monies that the CW was furnishing defendant Altman, as the CW stated, "I did . . . a bank deal on a million-dollar property that didn't even exist . . . the bank doesn't know nothing . . . and they don't care." Undaunted, defendant Altman advised the CW that he would ask his money-laundering contact about "the names" to use and relate that information to the CW in short order.

9

Near the end of the meeting, defendant Altman accepted for laundering a $75,000 cashier's check from the CW made payable to the Gemach Shefa Chaim. A review of bank records reflects that on or about July 19, 2007, the $75,000 cashier's check was posted to an account maintained by Valley National Bank in the name of Gmach Shefa Chaim.

23. Approximately two days later, on or about July 18, 2007, defendant Altman and Friedlander met with the CW at Altman's place of business in Union City. During this meeting, defendant Altman gave the CW three Valley National Bank envelopes containing approximately $12,500 in cash to complete the money-laundering transaction of June 26, 2007. Shortly after he gave the CW the cash, defendant Altman, Friedlander and the CW discussed the next group of money-laundering transactions. Because it was the summertime, defendant Altman indicated that it could take up to four weeks before his money-laundering contact could convert the CW's checks to cash. Defendant Altman explained to the CW that "smaller amounts," meaning approximately $50,000 to $150,000 at a time were preferable, because "[t]he way he [i.e., his money-laundering contact] works. The accounts he gets it . . . from A, from B, from C." Defendant Altman continued to detail the laundering process, "If I give him everything, he puts it in the accounts and he sees how he can get it."

24. During this meeting, defendant Altman provided the CW with the written names of the following four charitable organizations for laundering purposes: (a) Sanz International; (b) Bayaner Gemilas Chesed; (c) Cong. Shefa Chaim Dehasidi Sanz; and (d) Gmach Keren Hachased. Friedlander reiterated to the CW that the money-laundering process would be delayed because "summertime . . . it's very tough." Mindful of his illicit conduct, defendant Altman twice advised the CW that defendant Altman "didn't want [his] handwriting" on the laundering note and had a secretary copy it. Defendant Altman then instructed the CW on how to structure the forthcoming checks for laundering purposes, "put[ting] the amounts" of $150,000 for Sanz International, $100,000 for Bayaner Gemilas Chesed, $250,000 for Cong. Shefa Chaim Dehasidi Sanz, and $100,000 for Gmach Keren Hachased. The CW advised defendant Altman and Friedlander that the CW would check with his "partners" and get back to them.

25. On or about July 30, 2007, defendant Altman met with the CW at Altman's place of business in Union City. At the outset of the meeting, defendant Altman entered the office-area holding a white plastic shopping bag from which defendant Altman removed stacks of cash that he placed on the desk in front of the

CW. Defendant Altman then removed from his front pants pocket a similar plastic bag, which contained additional cash, and gave it to the CW. In total, defendant Altman provided the CW with approximately $39,500 in cash, which was a partial return on the $75,000 check defendant Altman accepted for laundering on or about July 18, 2007. Pursuant to the laundering arrangement, defendant Altman promised to pay the CW approximately $24,250 in cash to complete the money-laundering transaction once the funds were available.

26. On or about August 7, 2007, Friedlander met with the CW in Friedlander's car in Union City. At this meeting, Friedlander supplied the CW with the name of "Boyen Gimlas Chesed" for the purpose of laundering the CW's next check. Friedlander and the CW arranged to meet the next day, with the CW agreeing to bring a $50,000 check made out to the "Boyen Gimlas Chesed" and with Friedlander agreeing to bring at least $30,000 in cash soon thereafter as a return on monies owed from the last money-laundering deal. Friedlander stated, "If you bring me tomorrow [i.e., Tuesday] . . . I can have on Thursday . . . 30 for sure." Explaining that he already made arrangements with the money-laundering contact, Friedlander advised the CW, "I already called him up that I'm bringing a check . . ." Friedlander continued, "I already prepared him for 30 [meaning $30,000] . . . that's what Michael [i.e., Altman] told me." After placing a telephone call to and speaking with the money-laundering contact in the CW's presence, Friedlander confirmed, "30, he has for sure . . . he has more coming in tomorrow." Also, during the meeting, when the CW inquired as to whether the laundering fee could be cheaper if the CW supplied approximately $100,000, Friedlander indicated that he believed 10% was possible but that he would find out.

27. On or about August 8, 2007, Friedlander met with the CW outside on 5th Street in Union City. During the meeting, the CW provided Friedlander with a $50,000 cashier's check that was made payable to the Boyen Gimlas Chesed, the name of the organizational front that Friedlander supplied the CW for future laundering at the August 7, 2007 meeting. The CW stated to Friedlander, "This is the $50,000, made out to "Boyen Gimlas Chesed". Expecting the check for laundering, Friedlander replied, "Good, good . . . I'm going to see him today," a reference to the money-laundering contact who would convert the illicit check to cash for the CW. While giving Friedlander the $50,000 check for laundering, the CW reiterated that the monies were bank fraud proceeds and that they must remain hidden from the CW's ongoing bankruptcy proceedings. The CW stated, "Just don't tell him [i.e., the money-laundering contact] my name or anything, because this is money that I . . . 'schnookied'. . .

11

this is from a bank, and I have the bankruptcy . . ." Assuring the CW that he would conceal the criminal activity, Friedlander raised his hand and indicated that he would not say anything. Shortly thereafter, Friedlander placed a telephone call in the CW's presence to someone Friedlander indicated to be involved in the laundering. Friedlander then advised the CW that he was working to have cash for the CW that afternoon. Friedlander told the CW, "I'm gonna push it . . . I'll call you." Bank records indicate that on or about August 9, 2007, the $50,000 cashier's check was posted to an account maintained by North Fork Bank in the name of Boyen Oner Gemilas Chesed c/o David Goldhirsch.

28.   On or about August 10, 2007, defendant Altman met with the CW at Altman's place of business in Union City. During the meeting, defendant Altman gave the CW approximately $44,500 in cash. This cash amount represented $24,500 in cash to complete the money laundering transaction of July 16, 2007 and a partial return of $20,000 on the $50,000 check Friedlander accepted for laundering on or about August 8, 2007. Friedlander and defendant Altman mistakenly overpaid the CW $250 on this occasion. Haggling over the laundering fee charged, the CW stated to defendant Altman that Friedlander " . . . told me 10% with these new guys, fast turnaround, 10% he told me." Insisting that 15% was the correct fee, defendant Altman countered, "What are you talking about? . . . You misunderstood him [meaning Friedlander] . . . I made it very clear," a reference to the money laundering fee to be charged.

29.   On or about August 23, 2007, defendant Altman met with the CW at Altman's place of business in Union City. During the meeting, defendant Altman supplied the CW with approximately $22,500 in cash to complete the money-laundering transaction of August 8, 2007. Eager to continue profiting by way of laundering the CW's illicit proceeds, defendant Altman told the CW that his money-laundering contact advised him that if the CW needed more checks laundered, the money-laundering contact would be able to return cash to the CW more quickly. When the CW complained to defendant Altman that other money-launderers charge the CW 10% with a quick turnaround time and that Friedlander also quoted the CW a 10% fee, defendant Altman replied, "When he [i.e., the money-laundering contact] gave me this [i.e., the cash] he told me that he can get . . . money he can get it the same day . . . or something like that." Near the end of this money-laundering discussion, defendant Altman asked the CW about how much defendant Altman should request from his laundering contact in connection with the next transaction. The CW replied, "I don't know, 50, 75, [meaning $50,000 to $75,000] whatever he can do . . . the more he can do the better, I don't care."

30. On or about September 11, 2007, defendant Altman met with the CW at Altman's place of business in Union City. During the meeting, defendant Altman accepted for laundering a $25,000 cashier's check from the CW, which the CW described to defendant Altman as coming "from one of my bank schnookie deals." Consistent with defendant Altman's previous instructions, the check was made payable to the Gmach Shefa Chaim, one of the charitable organizations that defendant Altman used to launder funds. Defendant Altman indicated that he would return the cash to the CW to complete the money laundering transaction the next week. A review of bank records reflects that on or about September 12, 2007, the $25,000 cashier's check was posted to an account maintained by Valley National Bank in the name of Gmach Shefa Chaim.

31. On or about September 25, 2007, defendant Altman and Friedlander met with the CW at Altman's place of business in Union City. During the meeting, defendant Altman and Friedlander supplied the CW with approximately $21,250 in cash to complete the money laundering transaction commenced on or about September 11, 2007.

32. On or about October 9, 2007, defendant Altman met with the CW at Altman's place of business in Union City. At this meeting, defendant Altman accepted a $30,000 cashier's check from the CW as part of a money-laundering transaction. The check was made payable to the Gmach Shefa Chaim, and defendant Altman agreed to return cash to the CW in exchange for the 15% laundering fee. Bank records show that on or about October 18, 2007, the $30,000 cashier's check was posted to an account maintained by Valley National Bank in the name of the Gmach Shefa Chaim.

33. On or about October 15, 2007, defendant Altman met with the CW at Altman's place of business in Union City. At this meeting, defendant Altman returned to the CW approximately $25,800 in cash to complete the laundering transaction of October 9, 2007. Since defendant Altman should have returned only $25,500 pursuant to the money-laundering fee arrangement that he struck with the CW, defendant Altman mistakenly overpaid the CW $300 on this occasion.

34. On or about December 18, 2007, defendant Altman and Friedlander met with the CW at Altman's place of business in Union City. During this meeting, defendant Altman accepted another $25,000 cashier's check from the CW to launder consistent with their preexisting arrangement. Again making clear the monies were bank-fraud proceeds, the CW told defendant Altman,

"This is $25,000. The thing is this guy owes me a hundred-thousand. It's a cousin of mine and we took a loan on a property with Amboy Bank. Remember?" Defendant Altman replied, "Yeah." Noting that the loan was obtained on a non-existent property and that the CW previously engaged in other such bank frauds, the CW quipped to defendant Altman, "The property wasn't exactly there. Those were the good 'ole days' three years ago." Upon learning from the CW that the $25,000 check was purportedly obtained in such an illegal manner, defendant Altman laughed and responded, "I should have met you four years ago." At the conclusion of this money-laundering conversation, defendant Altman indicated to the CW that he would accept another $75,000 from the CW for laundering the next week and that "two weeks [was] enough" time to launder the $25,000 check and return the cash to the CW. As before, the check was made payable to the Gemach Shefa Chaim, defendant Altman's charitable organization front. A review of bank records indicates that on or about December 21, 2007, the $25,000 cashier's check was posted to an account maintained by Valley National Bank in the name of the Gmach Shefa Chaim.

35. On or about January 7, 2008, defendant Altman met with the CW at Altman's place of business in Union City. During this meeting, defendant Altman returned to the CW approximately $21,250 in cash to complete the laundering transaction of December 19, 2007.

36. On or about February 14, 2008, defendant Altman met with the CW at Altman's place of business in Union City. During this meeting, defendant Altman and the CW touched upon their next money-laundering transaction. Defendant Altman advised the CW that defendant Altman would be able to convert checks to cash that the CW expected to have in the coming weeks.

37. On or about July 10, 2008, defendant Altman and Friedlander met with the CW at Altman's place of business in Union City. Before defendant Altman arrived at the meeting, Friedlander and the CW discussed the illicit sources of the CW's money and the turnaround time necessary for defendant Altman and Friedlander to launder the money. During this meeting, the CW explained to Friedlander that he had profits from a counterfeit, "knock-off" pocketbook business and bank-fraud profits, "just like all the checks" that defendant Altman and Friedlander previously accepted from the CW for laundering. Inquiring as to the amount of illicit monies to be washed, Friedlander asked the CW, "so how much do you have to turn over?" Friedlander indicated that he would check on the turnaround time and instructed the CW to "write him [a reference to an unspecified

14

money-laundering contact] a few checks and let him start working on them."

38. At this same meeting, upon defendant Altman's arrival, defendant Altman and the CW also discussed the illegal origins of the CW's funds for laundering. The CW explained that "between the profits from [the CW's false label business] and the profits from the PNC money [i.e., bank-fraud proceeds], we got some money." Defendant Altman asked the CW "how much do you need" and "what period of time"? After confirming that approximately $200,000 to $300,000 in illicit monies needed to be laundered, defendant Altman indicated that he would be "going to the mountains," where he would learn from his money-laundering co-schemers how much time would be involved." Indicating that no cash was readily available at the time, defendant Altman advised the CW that "the guy didn't want to leave the bag here when he left for the mountains." At the meeting, defendant Altman accepted a $25,000 check from the CW to launder consistent with the pre-existing arrangement.

39. On or about July 24, 2008, defendant Altman met with the CW at Altman's place of business in Union City. During the meeting, defendant Altman removed a large stack of cash from his pants pocket and handed the CW approximately $15,250 in cash in furtherance of the laundering transaction of July 10, 2008. Referring to defendant Altman's money-laundering connection, defendant Altman explained that "he's short six," meaning that an additional $6,000 in cash would be needed to complete the money-laundering transaction of July 10, 2008. The CW explained to defendant Altman that "between my PNC profits and my profits from my bag money, you know, my label thing. All the money that I gave you until now and all my future money is from the profits from these two deals." Defendant Altman indicated that he understood and, gesturing with his hand in a breaking motion, further advised the CW that his money-laundering connection could wash $100,000 for the CW so ". . . long as you break it down into . . . smaller checks." Defendant Altman further advised the CW that he spoke with his money-laundering contact and that "he says he can do up to 300 [meaning $300,000] no problem" but that he would not do it, as the CW, inquired "in one shot." Again gesturing with his hands to explain the laundering process, defendant Altman stated that "he breaks it up . . . it doesn't go into one account."

40. On or about August 5, 2008, defendant Altman met with the CW at Altman's place of business in Union City. During the meeting, defendant Altman returned to the CW approximately $6,000 in cash to complete the laundering transaction of July 10, 2008.

Defendant Altman indicated to the CW that his money-laundering contact could wash up to $100,000 of the CW's bank-fraud and counterfeit-bag proceeds "quickly in a week . . . maybe less." Defendant Altman further instructed the CW to let defendant Altman know soon about the next money-laundering transaction because "I told the guy to hold 100 back," meaning that $100,000 in cash was then available for laundering purposes.

41. On or about September 4, 2008, defendant Altman met with the CW at Altman's place of business in Union City. During the meeting, defendant Altman accepted for laundering two checks from the CW. Pursuant to defendant Altman's instructions, one check in the amount of $25,000 was made payable to Boyen Gemilas Chesed, one of the organizations that defendant Altman used to launder funds. The other check, which was in the amount of $75,000, was made payable to VS Development.

42. On or about October 29, 2008, defendant Altman met with the CW at Altman's place of business in Union City. At this recorded meeting, defendant Altman retrieved a black plastic bag containing bundles of cash from a room in the office and then returned to the CW approximately $42,500 in U.S. currency to complete the laundering transaction of September 4, 2008. At this same meeting, defendant Altman accepted another $50,000 check from the CW for laundering. Taking the check, which was made payable to Boyen Gemilas Chesed, defendant Altman asked the CW, "same as usual" to which the CW responded, "Yeah, 50 [meaning $50,000]." Defendant Altman was reminded by the CW that the $50,000 were "profits" from the CW's "knock-off" bag business. At the conclusion of the meeting, defendant Altman indicated to the CW that there was no shortage of cash for laundering purposes and that in a week or two defendant Altman would be able to wash more checks.

43. On or about February 5, 2009, defendant Altman met with the CW at Altman's place of business in Union City. During the meeting, defendant Altman supplied the CW with approximately $21,250 in cash to complete an earlier money-laundering transaction. Handing several bank envelopes to the CW, Altman advised the CW that four of the envelopes contained $5,000 in cash and that one of the envelopes contained $1,250 in cash. At this meeting, defendant Altman also accepted another $25,000 check from the CW, who represented the monies to be profits from the CW's counterfeit bag business, to launder consistent with the ongoing money-laundering arrangement.

44. On or about March 31, 2009, defendant Altman met with the CW at Altman's place of business in Union City. At this

meeting, defendant Altman took four checks from the CW in order to convert them into cash less the set laundering fee. Pursuant to Altman's earlier instructions, one check in the amount of $10,000 was made payable to Boyen Gemilas Chesed, and three checks, each in the amount of $5,000, was made payable to "Holtzer." Defendant Altman placed the four checks in the inside, upper pocket of his jacket. For his part, defendant Altman gave the CW an envelope containing approximately $21,000 in cash further to the money-laundering transaction of February 5, 2009.

45. On or about May 4, 2009, defendant Altman faxed the CW a handwritten note, in which Altman supplied the CW with the names of the laundering fronts and the particular amounts of illicit proceeds to make payable to each front in order to conduct the next money-laundering transaction. The note stated the following:

Make contracts[2] To

| | |
|---|---|
| SHEFA CHAIM | 9500 |
| GEMRAS CHESEO | 8000 |
| " " | 7500 |

As revealed by the telephone number appearing as part of the fax header, defendant Altman faxed this document to the CW from Altman's place of business in Union City.

46. On or about May 7, 2009, defendant Altman met with the CW at Altman's place of business in Union City. During the meeting, Altman accepted three checks totaling $25,000 from the CW for laundering. Pursuant to Altman's faxed instructions of May 4, 2009, one check in the amount of $9,500 was made payable to Shefa Chaim, and two checks in the respective amounts of $8,000 and $7,500 were made payable to Gemras Cheseo. At the meeting, Altman gave the CW a bank envelope containing approximately $5,000 in cash as a partial return on the $25,000 money laundering transaction of March 31, 2009. Confirming that he still owed the CW approximately $16,250 in cash, Altman stated, "Yeah, 16 and change" and showed the CW a calculator bearing the numbers "16,250" on the screen.

---

[2] During the course of his dealings with the CW, defendant Altman used the word "contracts" as a coded-reference for the illicit proceeds Altman understood he was converting into cash for the CW in order to conceal their criminal origin.

17

47. Toward the end of the meeting on or about May 7, 2009, Altman and the CW also discussed the CW's counterfeit hand-bag business and an additional $25,000 in illicit "profits" Altman agreed to accept for laundering the following week. The CW stated, "We made a new bag . . . a copy of a Prada-thing . . . April was slow . . . now the profits are coming back." Agreeing to continue to launder the CW's represented criminal proceeds, defendant Altman impressed upon the CW the importance of getting advance notice so that Altman could make arrangements with his money-laundering contact that assisted in the washing process. Defendant Altman stated, "Just give me a heads-up before . . . I can't tell him and not show up, he gets pissed off at me."

48. On or about May 13, 2009, defendant Altman met with the CW at Altman's place of business in Union City. During the meeting, defendant Altman returned to the CW approximately $14,900 in cash as part of the $16,250 in cash owed from the money laundering transaction of May 7, 2009. Removing a bundle of bills from his pocket, defendant Altman first handed the CW approximately $5,000 in cash. The CW asked defendant Altman, "You carry everything on you?" Altman affirmed, "Yeah . . . I have no choice." While continuing their discussion, Altman next removed a bank envelope containing cash from his jacket pocket, which he gave to the CW, and then handed the CW another stack of cash. The three stacks of cash Altman handed the CW totaled approximately $14,900. Defendant Altman verified that he still owed the CW approximately $16,250 in cash to complete the most recent money-laundering transaction. Indicating that he did not then have all the washed money, Altman stated that he was "a little bit short" and affirmed that the balance still owed was approximately $1,350.

49. On or about June 18, 2009, defendant Altman met with the CW at Altman's place of business in Union City. During the meeting, defendant Altman accepted two checks, one in the amount of $40,000, and one in the amount of $30,000, from the CW for laundering. Noting that they were made payable to Organization 3, Altman stated, "both to BGC." Altman was reminded by the CW that the $70,000 were "profits" from the CW's "knock-off" bag business. Regarding the money-laundering arrangement and ongoing scheme to assist the CW in obtaining approvals for development projects in exchange for corrupt payments, defendant Altman was informed by the CW that he would be paid approximately $10,000 a month for his assistance with the development work and would be supplied with approximately $25,000 to $100,000 in "contracts," meaning illicit proceeds to be washed in exchange for a 15% laundering free. Defendant Altman agreed to the arrangement. Defendant Altman made copies of the checks and then left the CW

18

at Altman's place of business. Altman advised the CW that he needed to meet with "a guy" in "Union City" in order to pick-up the cash. Approximately 13 minutes after leaving to retrieve the cash, Altman returned to Altman's place of business and advised the CW that he gave his money-laundering contact the checks but that "I'm gonna have it [meaning the washed cash] Monday."

50. Later that same day, on or about June 18, 2009, an individual ("the individual") picked up approximately $40,000 in cash for the CW from another individual connected with Altman's money-laundering ring in Borough Park, New York as a partial return on the last money-laundering transaction. On or about June 19, 2009, the individual met with the CW at the individual's residence in Brooklyn, New York and supplied the CW with the $40,000 in cash.

51. On or about June 24, 2009, defendant Altman met with the CW at Altman's place of business in Union City. During the meeting, Altman and the CW discussed future money-laundering business. Inquiring as to the cash available for laundering the proceeds the CW represented to be derived illegally from his counterfeit-handbag profits, the CW asked Altman, "How's the money coming along? Is it tight this week or is it good?" Noting that the CW expressed discontent at the June 19th meeting that Altman furnished his money-laundering contact with $70,000 in checks without immediately returning any cash that day to the CW, Altman advised the CW that "you gave me a hard time last week." Still, interested in laundering more monies he understood to be illegally obtained, Altman asked the CW when "the next checks [would be] coming" and clarified with the CW that "a hundred," meaning $100,000 in illegal profits, would be ready for Altman's washing between on or about July 13, 2009 and on or about August 1, 2009.

52. Between approximately May 2007 and June 2009, defendant Altman engaged in money laundering transactions with the CW totaling approximately $668,000 in funds represented by the CW to involve criminal activities.